Thomas **BURNETT, Sr.,**
**et al., Plaintiffs,**

v.

**AL BARAKA INVESTMENT AND**
**DEVELOPMENT CORPORA-**
**TION, et al., Defendants.**

**No. CIV.A.02–1616 JR.**

United States District Court,
District of Columbia.

Nov. 14, 2003.

Harry Huge, Harry Huge Law Firm, LLP, Washington, DC, Jayne H. Conroy, Hanly & Conroy, LLP, New York, NY, George R. Blakey, Notre Dame, IN, Edward D. Robertson, Mary Doerhoff Winter, Bartimus, Frickleton, Robertson & Obetz, Jefferson City, MO, for Plaintiffs.

Martin F. McMahon, Mitchell R. Berger, Patton Boggs, LLP, Washington, DC, Ronald S. Liebman, Ugo A. Colella, Patton Boggs, LLP, Christopher M. Curran, Frank Panopoulos, Nicole Erb, White & Case, LLP, Washington, DC, Michael Hadeed, Becker, Hadeed, Kellogg, & Berry, Springfield, VA, Maher H. Hanania, Hanania Khader & Nawash, Falls Church, VA, Donna M. Sheinbach, Luque Sheinbach, LLP, Nancy Luque, Alan Robert Kabat, Bernabei & Katz, PLLC, William H. Jeffress, Jr., Baker Botts L.L.P., Matthew H. Kirtland, Fulbright & Jaworski, LLP, Mark C. Hansen, Michael J. Guzman, Michael K. Kellogg, Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C., David Patrick Donovan, Wilmer, Cutler & Pickering, Louis Richard Cohen, Wilmer, Cutler & Pickering, Washington, DC, Matthew Henry Simmons, Roger C. Simmons, Victor E. Cretella, III, Gordon & Simmons, Frederick, MD, Lynne A. Bernabei, Bernabei & Katz, PLLC, Washington, DC, Jonathan L. Greenblatt, Henry Sabath Weisburg, Brian Howard Polovoy, Shearman & Sterling, New York, NY, Stephen Joseph Brogan, Washington, DC, John David Shakow, King & Spalding, Washington, DC, Peter J. Kahn, Williams & Connolly, LLP, Washington, DC, Thomas Peter Steindler, McDermott, Will & Emery, Washington, DC, Christopher Talbott Lutz, Steptoe & Johnson, LL, Washington, DC, John C. Millian, Gibson, Dunn & Crutcher, LLP, Washington, DC, Brian Arthur Coleman, Drinker Biddle & Reath, Michael J. McManus, Drinker Biddle & Reath, LLP, Washington, DC, for Defendants.

James F. Peterson, Judicial Watch, Inc., Washington, DC, for Intervenor.

### *MEMORANDUM OPINION*

ROBERTSON, District Judge.

This memorandum addresses the second group of dispositive motions to be considered in this action brought by victims and representatives of victims of the terrorist attacks of September 11, 2001. My opinion on the first group of motions is reported as *Burnett v. Al Baraka Invest. & Devel. Corp.*, 274 F.Supp.2d 86 (D.D.C. 2003) (*"Burnett I"*). The motions now before me, filed by Prince Turki Al–Faisal bin Abdulaziz Al–Saud ("Prince Turki") and Prince Sultan bin Abdulaziz Al–Saud ("Prince Sultan"), seek dismissal on grounds, *inter alia,* of lack of subject matter jurisdiction and lack of personal jurisdiction. The motions have been fully briefed. Oral argument was presented on October 17, 2003.

It is undisputed that, at all times relevant to this action, Prince Turki was the Director of Saudi Arabia's Department of

General Intelligence ("DGI" or "Istakhbarat").[1] It is also undisputed that, at all times relevant to this lawsuit, Prince Sultan was Saudi Arabia's third-ranking government official. He was—and is—minister of defense and aviation, inspector general of the armed forces, chairman ex-officio of Saudi Arabian Airlines, chairman of the Supreme Council for Islamic Affairs ("Supreme Council"), and head of the Special Committee of the Council of Ministers ("Special Committee"). The Supreme Council carries out the foreign policies of Saudi Arabia as they relate to Islamic Affairs conducted abroad, including making recommendations to the Council of Ministers about requests for assistance from Islamic organizations based outside of Saudi Arabia. The Special Committee exercises discretion over disbursements, which have included grants to Islamic charitable organizations, in furtherance of the national and foreign policy of Saudi Arabia, as determined by the Council of Ministers.

The Third Amended Complaint ("3AC") makes the following allegations as to Prince Turki:

- that "Osama bin Laden offered [him] the engineering equipment available from his family's construction company and suggested bolstering Saudi forces with Saudi militants who he was willing to recruit." Complaint, at ¶¶ 340–41.

- that, as head of DGI, he "was in a position to know the threat posed by bin Laden, al Qaeda, the Taliban." Id., at ¶ 343.

- that he "had an ongoing relationship with Osama bin Laden from the time they first met in Islamabad, Pakistan," and personally met with bin Laden "at least five times ... during the mid-eighties to mid-nineties." Id., at ¶¶ 341, 344.

- that, in 1995, while under his direction, Istakhbarat "decided to give massive financial and material support to the Taliban." Id., at ¶ 344.

- that he is "implicate[d] ... as the facilitator of [money transfers from wealthy Saudis] in support of the Taliban, al Qaeda, and international terrorism" and that "Istakhbarat served as a facilitator of Osama bin Laden's network of charities, foundations, and other funding sources." Id., at ¶¶ 346, 350.

- that, in July 1998, he attended a meeting in Kandahar, Afghanistan, which led to an agreement that "Osama bin Laden and his followers would not use the infrastructure in Afghanistan to subvert the royal families' control of Saudi government and in return, the Saudis would make sure that no demands for the extradition of terrorist individuals, such as Osama bin Laden, and/or for the closure of terrorist facilities and camps." And that, "[a]fter the meeting, 400 new pick-up trucks arrived in Kandahar for the Taliban, still bearing Dubai license plates." Id., at ¶¶ 344, 348.

- that, in 1998 and 1999, he met with the Taliban, and that he "promised to provide oil and generous financial assistance to the Taliban." Id.

- that he "was instrumental in arranging a meeting in Kandahar between Iraqi senior intelligence operative [sic], the Ambassador to Turkey Faruq al-Hijazi, and Osama bin Laden, in December of 1998." Id., at ¶ 349.

- that he is "implicated" in the funneling of money "from the Saudi-based company, Mushayt for Trading Establish-

---

1. Prince Turki is now Ambassador of Saudi Arabia to the United Kingdom.

ment ... through Spanish corporations to entities and individuals known to be associated with the al Qaeda terrorist organization in Europe." *Id.,* at ¶¶ 345, 376.

As to Prince Sultan, the 3AC alleges:

- that he met with "Osama bin Laden[, who] offered the engineering equipment available from his family's construction company and suggested bolstering Saudi forces with Saudi militants who he was willing to recruit." *Id.,* at ¶ 340.

- that he "took radical stands against western countries and publically supported and funded several Islamic charities that were sponsoring Osama bin Laden and al Qaeda operations," including the International Islamic Relief Organization ("IIRO"), the Muslim World League ("MWL"), the World Assembly of Muslim Youth ("WAMY") and Al–Haramain Islamic Foundation ("Al–Haramain"). *Id.,* at ¶ 353.

- that he "has been involved in the sponsorship of international terrorism through the IIRO and other Saudi-funded charities." *Id.,* at ¶ 354.

- that "[a] Saudi embassy press release announced in April 2001 that 'Prince Sultan affirms [the] Kingdom's Support' for the Palestinian Intifada, to the tune of $40 million already disbursed to 'the families of those martyred' and other 'worthies.'" *Id.,* at ¶ 355.

- that, having knowledge of "the role of Saudi charitable entities ... in financing the al Qaeda terrorist organization," he "personally funded [the Islamic charities identified in ¶ 353]" with donations amounting to at least $6,000,000. *Id.,* at ¶¶ 358–59.

- that, "[s]ince the IIRO's creation in 1978, [he] participated by donations and various gifts to the charity. In 1994 alone, he donated $266,652 to the [IIRO]. Since 1994, the amount funneled by [him] into IIRO is reported to be $2,399,868. [His] role in directly contributing to and in the oversight of IIRO evidences his material sponsorship, aiding and abetting of international terrorism. [He] maintains close relations with the IIRO organization headquarters and knew or should have known these assets were being diverted to al Qaeda." *Id.,* at ¶ 360.

- that "[he] is also a large financial contributor of the [MWL]. [He] donated during a television fundraising campaign for MWL: The total collection made as a result of the television campaign was SR 45,000,000, with the Emir of Riyadh, Prince Sultan, donating a million Saudi Riyals ($533,304)." *Id.,* at ¶ 361.

- that "[he] is also a regular donator to the [WAMY] .... WAMY has been officially identified as a 'suspected terrorist organization' by the FBI since 1996 and has been the subject of numerous governmental investigations for terrorist activities." *Id.,* at ¶ 362.

- that, "[a]t best, [he] was grossly negligent in the oversight and administration of charitable funds, knowing they would be used to sponsor international terrorism, but turning a blind eye. At worst, [he] directly aided and abetted and materially sponsored al Qaeda and international terrorism." *Id.,* at ¶ 363.

## I. SUBJECT MATTER JURISDICTION

Prince Turki and Prince Sultan assert foreign sovereign immunity and argue in their motions that the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.* ("FSIA"), does not overcome that immunity. The FSIA—in effect a series of exceptions to a general rule of immunity for foreign sovereigns—confers original ju-

risdiction in district courts over claims for relief "with respect to which the foreign state is not entitled to immunity under [the FSIA] or under any applicable international agreement." 28 U.S.C. § 1330(a); *see Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989) ("The FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court."). "The FSIA 'must be applied by the district courts in every action against a foreign sovereign, since subject-matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity.' " *Id.* at 434–35, 109 S.Ct. 683 (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983)).[2]

■ Individual office holders can enjoy foreign sovereign immunity, *see El–Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 671 (D.C.Cir.1996), but "not ... for acts that are not committed in an official capacity." *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1027 (D.C.Cir. 1997). In their separate motions, Prince Turki and Prince Sultan (i) assert that the allegations against them relate only to actions taken in their official capacities, and (ii) argue that the claims against them do not fit within any of the FSIA's exceptions to the general rule of immunity.

■ "Generally, in entertaining a motion to dismiss, the district court must accept the allegations of the complaint as true, and construe all inferences in the plaintiff's favor." *Id.* at 1027 (citing *Foremost–McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 440 n. 3 (D.C.Cir. 1990)). However, "[w]here the motion to dismiss is based on a claim of foreign sovereign immunity, which provides protection from suit and not merely a defense to liability, ... the court must engage in sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case before trial." *Id.* at 1027–28 (citation and internal quotation marks omitted). The district court must "go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C.Cir. 2000).

## A. OFFICIAL CAPACITY

■ Where there is a dispute about whether an individual was acting in an official capacity, "the relevant inquiry ... focuses on the nature of the individual's alleged actions, rather than the alleged motives underlying them." *Jungquist*, 115 F.3d at 1028. And, if there was a convergence between official duties and personal interest, "[s]uch a circumstance does not serve to make [the] action any less an action of [a] sovereign." *Chuidian v. Philippine Nat. Bank*, 912 F.2d 1095, 1107 (9th Cir.1990).

Prince Turki and Prince Sultan vigorously dispute the accuracy of the allegations against them. For purposes of their motions, however, they assert that, whatever their actions, they were performed in their official capacities. Prince Turki maintains that any acts he may have done with respect to the Taliban were consistent with his duties as the Director of Istakhbarat. Prince Sultan maintains that his role in providing financial assistance to the In-

---

2. The FSIA confers jurisdiction over *non-jury* actions, but it is not grounds for dismissal that the claims against Prince Turki and Prince Sultan are joined with jury-triable claims against other defendants. *See generally In re Air Crash Disaster Near Roselawn, Ind. on Oct. 31, 1994*, 96 F.3d 932, 947 (7th Cir. 1996); *Engle v. Mecke*, 24 F.3d 133, 135 (10th Cir.1994); *Group Health Inc. v. Blue Cross Ass'n*, 793 F.2d 491, 498 (2d Cir.1986).

ternational Islamic Relief Organization, the Muslim World League, the World Assembly of Muslim Youth or Al–Haramain Islamic Foundation, was official, in his capacity either as Chairman of the Supreme Council, or as head of the Special Committee.

### 1. *Prince Turki*

Prince Turki has submitted several documents to support his position. One is his own declaration. In it, he states that "[a]ll of [his] interactions with Osama bin Laden, Al–Qaeda, and the Taliban were in [his] official capacity as Director of the DGI." Prince Turki Decl., at ¶ 5. He states that Saudi Arabia "provided no [direct] aid to the Taliban" and that, in June 1998, he met with Taliban leader Mullah Omar in Kandahar "to convey an official Saudi request to extradite Osama bin Laden to Saudi Arabia for trial." *Id.*, at ¶¶ 8, 11. He states that in September 1998, "when [he] returned to Kandahar for another meeting with Mullah Omar to pursue Osama bin Laden's extradition, Mullah Omar spoke to [him] abusively and declared that the Taliban would not extradite Osama bin Laden, whom Mullah Omar praised," *id.*, at ¶ 12; and that, as a result of Omar's refusal to extradite bin Laden, "[he] recommended that Saudi Arabia withdraw its representative from Kabul and suspend diplomatic relations with the Taliban Government, which Saudi Arabia did in September 1998," *id.*, at ¶ 13.

In response to the allegation that he or Istakhbarat was a "facilitator" of money transfers or provided material resources to al Qaeda, bin Laden, or the Taliban, Prince Turki declares that, "[a]t no time during the period in question did [he] or the DGI knowingly transfer funds or facilitate the transfer of funds, either directly or indirectly, to Osama bin Laden or Al–Qaeda." *Id.*, at ¶ 14. He also states that "[n]either [he] nor, to [his] knowledge, anyone else in the Saudi government ever reached any agreement with any representatives of Osama bin Laden or Al–Qaeda regarding the extradition of terrorists ... [or] offered material assistance to representatives of Osama bin Laden or Al–Qaeda in exchange for not attacking Saudi Arabia. Neither [he] nor, to [his] knowledge, anyone else in the Saudi government ever promised to provide oil and financial assistance to the Taliban. Neither [he] nor, to [his] knowledge, anyone else in the Saudi government ever arranged for 400 pick-up trucks to be delivered to Kandahar for the benefit of the Taliban." *Id.*, at ¶ 16.

Prince Turki has also submitted a transcript of an December 10, 2001, interview he conducted with ABC News: Nightline. During the interview, an ABC News tape of Osama bin Laden was played. According to the transcript, upon learning of Prince Turki's mission to Kandahar to secure his extradition, bin Laden stated: "He returned empty-handed. He looked ashamed, as if he had come at the request of the American government. It's none of the business of the Saudi regime to come and ask for handing over Osama bin Laden." Tr., *Nightline* (ABC television broadcast, December 10, 2001).

The plaintiffs contend that "[n]othing in [their] allegation [about Prince] Turki's role as facilitator related in any way to his position in the Saudi government," Response, at 15, but they have made no showing that any of Prince Turki's alleged actions were taken other than in his official capacity. The absence of such a showing compels the conclusion that the allegations against Prince Turki only relate to actions he took in his official capacity. Further, because the plaintiffs' suggestions of individual activity are only conclusory, I will not grant plaintiffs' request for jurisdictional discovery. Under these circumstances, "discovery would 'frustrate the significance and benefit of

entitlement to immunity from suit.'" *El–Fadl,* 75 F.3d at 671 (quoting *Foremost–McKesson,* 905 F.2d at 449).

### 2. *Prince Sultan*

Prince Sultan has also filed documents in support of his submission, including declarations by financial officers of the IIRO, the MWL, the WAMY, and Al–Haramain to the effect that donations to their organizations were received from Saudi funds on behalf of Saudi Arabia, but not from or on behalf of Prince Sultan personally. *See* Saleh Abdullah Al Saykhan Decl., at ¶¶ 3–4; Ali Muhammad Al–Kamal Decl., at ¶ C; Mutaz Saleh Abu Unuq Decl., at ¶ 4; Khalid Eid Al–Dhahiri Decl., at ¶¶ 3–4. These affidavits have limited probative value, lacking proper foundations to establish that the affiants could have known the actual source of the monies they received, and not having been subjected to cross-examination. The value of the plaintiffs' showing that Prince Sultan did give money to these organizations in his personal capacity, however, is no greater: Saudi press agency releases (the proper translations of which are in dispute) referring to Prince Sultan's contributions as personal; a May 3, 2003 Global News Wire discussing the selection of Prince Sultan for the Sheikh Rashid Humanitarian Personality of the Year Award in honor of his contributions to charity, and a January 21, 1999 Ain–Al–Yaqeen article stating that "Prince Sultan ... donated half a million riyals to the [IIRO] in the Kingdom of Saudi Arabia [and that t]his donation was the second instalment of the generous annual donation of one million riyals which His Royal High-ness the Prince gives to the organi[z]ation."

■ The record does not support a clear resolution of the disputed issue of fact necessary to a ruling on the motion to dismiss the claims plaintiffs have made against Prince Sultan in his personal capacity, *see Phoenix Consulting, supra.* To the extent Prince Sultan was acting in his official capacity when he made or approved donations to the IIRO, the WML, the WAMY and Al–Haramain, however, he is entitled to immunity—unless one or more of the exceptions to the FSIA applies.

### B. EXCEPTIONS TO IMMUNITY

■ When exceptions to the FSIA are invoked—here plaintiffs rely upon the "commercial activities" exception, 28 U.S.C. § 1605(a)(2), and the "noncommercial tort" exception, 28 U.S.C. § 1605(a)(5) [3]—it is the defendants' burden to prove them inapplicable. *Phoenix Consulting, supra.* To sustain that burden, "the defendant may challenge either the legal sufficiency or the factual underpinning of an exception." *Id.* As the Court of Appeals has explained:

> If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff. In some cases, however, the motion to dismiss will present a dispute over the factual basis of the court's subject matter jurisdiction under the FSIA,

---

**3.** The Princes also say that the 3AC invokes the "state-sponsored terrorism" exception, 28 U.S.C. § 1605(a)(7). However, "only a defendant that has been specifically designated by the State Department as a 'state sponsor of terrorism' is subject to the loss of its sovereign immunity" under this exception. *Bettis v. Islamic Republic of Iran,* 315 F.3d 325, 329 (D.C.Cir.2003) (citation omitted). It is undisputed that the Kingdom of Saudi Arabia had not been designated a "state sponsor of terrorism" on September 11, 2001. The state-sponsored terrorism exception is inapplicable.

that is, either contest a jurisdictional fact alleged by the plaintiff, or raise a mixed question of law and fact. When the defendant has thus challenged the factual basis of the court's jurisdiction, the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant. Instead, the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon a motion to dismiss.

*Id.* at 40 (internal citations omitted).

1. *§ 1605(a)(2) commercial activity exception*

The "commercial activity" exception is invoked only with respect to Prince Sultan and is readily disposed of. Under this exception, foreign states are not immune in any case

in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). "Crucial to each of the three clauses of [§ ] 1605(a)(2) is the phrase 'commercial activity.'" *Tex. Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 307 (2d Cir.1981). "Commercial activity" is defined by the FSIA as:

either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d). The issue, then, is "whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce." *Saudi Arabia v. Nelson*, 507 U.S. 349, 360–61, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (internal quotation marks omitted; emphasis in original)).

■ Admittedly, this standard is open to more than one interpretation, depending on how one broadly the court defines the type of action allegedly engaged in by Prince Sultan. *See Segni v. Commercial Office of Spain*, 835 F.2d 160, 166 (7th Cir.1987) (quoting H.R. REP. No. 94–1487, at 16 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6615 ("It has seemed unwise to attempt an excessively precise definition of [commercial activity], even if that were practicable.")). Here, the plaintiffs have encouraged a very broad definition. They argue that the IIRO, the WML, the WAMY, and Al–Haramain participated in commercial activity either by "providing charitable services or engaging in terrorist activities." Memorandum of Law in Opposition to Motion of Prince Sultan to Dismiss the Claims Against Him, at 26. They say that these organizations (each of them a defendant in this action), financed al Qaeda's "purchasing [of] equipment, renting [of] property, [and] manufacturing [of] bombs" and that Prince Sultan's contributions were " 'in connection' with this commercial activity." *Id.* They also encourage the Court to find that these contributions had the "direct effect" in the United States of causing the September 11 attacks, by finding that the attacks could not have been carried out without Saudi funding and that the very purpose of the funding was to carry out that type of attack. *Id.*, at 27.

The act of contributing to a foundation is not within our ordinary understanding of "trade and traffic or commerce," nor, apparently, was it within the contemplation of the Congress that enacted the FSIA in 1976:

As the definition [of "commercial activity"] indicates, the fact that goods or services to be procured through a contract are to be used for a public purpose is irrelevant; it is the essentially commercial nature of an activity or transaction that is critical. Thus, a contract by a foreign government to buy provisions or equipment for its armed forces or to construct a government building constitutes a commercial activity. The same would be true of a contract to make repairs on an embassy building. Such contracts should be considered to be commercial contracts, even if their ultimate object is to further a public function.

By contrast, a foreign state's mere participation in a foreign assistance program administered by the Agency for International Development (AID) is an activity whose essential nature is public or governmental, and it would not itself constitute a commercial activity.... However, a transaction to obtain goods or services from private parties would not lose its otherwise commercial character because it was entered into in connection with an AID program....

H.R. REP. No. 94–1487, at 16, *reprinted in* 1976 U.S.C.C.A.N. at 6615.

Granted that "the primary purpose of the Act is to 'restrict' the immunity of a foreign state to suits involving a foreign state's public acts," *Tex. Trading,* 647 F.2d at 308, it is nevertheless too much of a stretch to find the allegations against Prince Sultan "connect[ed] to" commercial activity.

2. *§ 1605(a)(5) noncommercial tort exception*

Plaintiffs' invocation of the "noncommercial tort" exception requires a deeper analysis. Section 1605(a)(5) provides in relevant part that:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

(5) ... in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment ....

28 U.S.C. § 1605(a)(5). Subsection A then provides an exception to this exception:

[Section (a)(5) ] shall not apply to ... any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused ....

28 U.S.C. § 1605(a)(5)(A).

Prince Turki and Prince Sultan argue that plaintiffs cannot possibly establish the causal links that would be necessary to bring the noncommercial tort exception into play. In any event, they argue, the allegations of the 3AC describe the exercise of discretionary functions—decisions by Prince Turki, as Director of DGI, about how to protect the Saudi people from terrorism, and decisions by Prince Sultan, as Chairman of the Supreme Council or head of the Special Committee, as to which organizations should be given government monies in furtherance of Saudi policies.

### a. Noncommercial torts

The 3AC alleges that Prince Turki "served as a facilitator of Osama bin Laden's network of charities, foundations, and other funding sources," and that he "provide[d] oil and generous financial assistance" to the Taliban. It also alleges that Istakhbarat, while under Prince Turki's direction, "decided to give massive financial and material support to the Taliban." The 3AC alleges that Prince Sultan "publicly supported and funded several Islamic charities that [he knew] were sponsoring Osama bin Laden and al Qaeda operations," including the IIRO, the MWL, the WAMY and Al–Haramain. In simple terms, these allegations amount to claims that Prince Turki and Prince Sultan, acting in their official capacities, funded or provided material resources to those who funded or provided material resources to the terrorists who perpetrated the September 11th attacks.

 The question is whether those claims can be made to fit within the noncommercial tort exception. The answer is, only if it has been properly alleged that the plaintiffs' claims are "for personal injury or death ... *caused by* the tortious act or omission of ... any official ... of [a] foreign state while acting within the scope of his office."[4]

 These motions do not present the occasion for a general disquisition on the subject of causation, however. To repeat an observation I made in deciding the first round of dispositive motions in this case, it is still "too soon to attempt a precise for-

mulation of the level of knowledge and intent or certainty of causation that will be necessary to get plaintiffs' claims to a jury," *Burnett I*, 274 F.Supp.2d at 102. Such a precise formulation is, in any case, not necessary to a decision on the FSIA issue presented here. An attenuated chain of causation may or may not suffice to require persons who cannot claim foreign sovereign immunity to answer for the September 11 attacks, but, in the context of motions to dismiss claims brought under the FSIA, I must "start from the settled proposition that the subject-matter jurisdiction of the lower federal courts is determined by Congress 'in the exact degrees and character which to Congress may seem proper for the public good.'" *Amerada Hess*, 488 U.S. at 433, 109 S.Ct. 683 (quoting *Cary v. Curtis*, 44 U.S. (3 How.) 236, 245, 11 L.Ed. 576 (1845)). And I am bound by Circuit precedent:

> It has repeatedly been recognized that, although cast in general terms, the "tortious act" exception was designed primarily to remove immunity for cases arising from traffic accidents. This is scarcely to say that the exception applies *only* to traffic accidents; rather, the point is that *the legislative history counsels that the exception should be narrowly construed so as not to encompass the farthest reaches of common law.*

*MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 921 (D.C.Cir. 1987) (internal citations omitted; emphasis added).

---

4. Prince Turki and Prince Sultan also argue that the words "occurring in the United States" of § 1605(a)(5) preclude the claims against them under this exception because the *entire* tort must have occurred in the United States, meaning both the tortious conduct and the injury resulting from that conduct, and all of their alleged actions took place in Saudi Arabia or elsewhere. I disagree. "[T]he For-

eign Sovereign Immunities Act, ... preserves immunity for tort claims unless *injury or death occurs in the United States*." *Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774, 775 (D.C.Cir.1984) (Edwards, J., concurring; emphasis added); *see also Letelier v. Republic of Chile*, 488 F.Supp. 665, 665 (D.D.C.1980). The deaths and injuries of which the plaintiffs complain "occurr[ed] in the United States."

In the FSIA context, plaintiffs' allegations that (i) Prince Turki or Prince Sultan funded (ii) those who funded (iii) those who carried out the September 11th attacks would stretch the causation requirement of the noncommercial tort exception not only to "the farthest reaches of the common law," but perhaps beyond, to terra incognita. I find, accordingly, that the noncommercial tort exception afforded by § 1605(a)(5) is not applicable.[5]

### b. *Discretionary function*

■■■ My ruling that the 3AC does not bring the claims against Prince Turki and Prince Sultan within the "noncommercial tort" exception makes it unnecessary to decide whether the "discretionary function" exception (to the exception) also applies. In case a reviewing court should

reject that ruling, however, I will briefly state my reasons for concluding that the official acts plaintiffs ascribe to Prince Turki and Prince Sultan are squarely covered by the "discretionary function" language of subsection A. Were it not for the plaintiffs' reliance upon *Letelier v. Republic of Chile*, 488 F.Supp. 665, 673 (D.D.C. 1980), and *Liu v. Republic of China*, 892 F.2d 1419 (9th Cir.1989), indeed, this conclusion would be nearly self-evident: Prince Turki, as director of intelligence, taking acts to protect Saudi Arabia from terrorism, and Prince Sultan, as chairman of the Supreme Council, making recommendations to the Council of Ministers about requests for assistance from Islamic organizations outside Saudi Arabia or, as head of the Special Committee, deciding what disbursements should be made to

---

**5.** This conclusion is buttressed by the language of another FSIA exception, § 1605(a)(7): "A foreign state shall not be immune from the jurisdiction of courts of the United States ... in any case—(7) ... in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, *or the provision of material support or resources* ... for such an act if such act or *provision of material support* is engaged in by an official ... of such foreign state while acting within the scope of his or her office ...." (emphasis added).

The noncommercial tort exception, § 1605(a)(5), makes no mention of the "provision of material support." A canon of statutory construction holds that "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (citations and internal quotation marks omitted); *see also, e.g., AT&T Corp. v. F.C.C.*, 323 F.3d 1081, 1086 (D.C.Cir.2003). This method of statutory construction "announces a presumption, not a hard-and-fast rule," *New England Public Communications Council, Inc. v. F.C.C.*, 334 F.3d 69, 76 (D.C.Cir.2003), but it is a power-

ful presumption that both the Supreme Court and the D.C. Circuit have applied to the FSIA's exceptions. *See Amerada Hess*, 488 U.S. at 441, 109 S.Ct. 683 ("Congress' decision to use explicit language in § 1605(a)(2), and not to do so in § 1605(a)(5), indicates that the exception in § 1605(a)(5) covers only torts occurring within the territorial jurisdiction of the United States."); *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 843 (D.C.Cir.1984) ("[A] comparison of the noncommercial tort exception—section 1605(a)(5) ...—with the commercial activity exception, section 1605(a)(2), demonstrates that Congress intended the former to be narrower than the latter.... When Congress uses explicit language in one part of a statute to cover a particular situation and then uses different language in another part of the same statute, a strong inference arises that the two provisions do not mean the same thing.").

In this case, the allegations against Prince Turki and Prince Sultan describe the "provision of material support or resources," but the FSIA exception which recognizes such acts, § 1605(a)(7), does not apply here, *see, supra*, n. 3, and, by application of the *Russello* presumption, the omission of "provision of material support" from § 1605(a)(5) should be treated as intentional.

Islamic charitable organizations, were clearly making "decisions grounded in social, economic, and political policy." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense ("Varig Airlines")*, 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984).

Plaintiffs rely upon *Letelier v. Republic of Chile*, 488 F.Supp. 665, 673 (D.D.C. 1980), and *Liu v. Republic of China*, 892 F.2d 1419 (9th Cir.1989), for the proposition that there is "no discretion to 'perpetrate conduct designed to result in' terrorist attacks." Plaintiff's Mem. of Law in Opposition to Motion of Prince Sultan to Dismiss, at 22. The two cases do instruct that, in appropriate circumstances, terrorist acts cannot be considered "discretionary," but they are factually distinguishable from this case. *Letelier* and *Liu* involved causal links significantly shorter and more direct than those alleged here: in *Letelier*, the foreign sovereign and sovereign officeholders were alleged to have "caused or aided" in the assassinations; in *Liu*, the foreign state was held vicariously liable for the actions of its employee, criminal acts of a rather different character and order. *See Letelier*, 488 F.Supp. at 673 (holding that "there would be no 'discretion' within the meaning of section 1605(a)(5)(A) to order or to aid in an assassination and were it to be demonstrated that a foreign state has undertaken any such act in this country, that foreign state could not be accorded sovereign immunity under subsection (A) for any tort claims resulting from its conduct"); *Liu*, 892 F.2d at 1430 (excepting from immunity, under § 1605(a)(5), a

foreign state which benefitted from a government employee's use of governmental authority to silence, by murder, an outspoken critic of the government).

## II. PERSONAL JURISDICTION

Prince Sultan does not enjoy foreign sovereign immunity from claims that arise from contributions he allegedly made to the IIRO, the WML, the WAMY, and Al-Haramain in his personal capacity. His motion to dismiss those claims accordingly asserts, not lack of subject matter jurisdiction—which is conferred by the ATA for the claims of United States nationals and by the ATCA for the claims of foreign nationals,[6] *see Burnett I*—but lack of personal jurisdiction. "[B]ecause the [ATA] provides for nationwide service of process,"[7] the relevant Due Process inquiry for personal jurisdiction purposes, assuming that the defendant has been properly served, "is whether the defendant has had minimum contacts with the United States." *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th. Cir. 1994) (citations omitted). That inquiry, in turn, is constrained by the question of whether " 'maintenance of the suit . . . offend[s] 'traditional notions' of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citation omitted).

Plaintiffs have made a desultory effort to sustain their burden of showing that Prince Sultan's visits to the United States (and his presence here years ago as a college undergraduate) would support the

---

**6.** The plaintiffs have also alleged RICO as a basis for this Court's jurisdiction, but, for the reasons explicated in *Burnett I*, 274 F.Supp.2d at 100–02, jurisdiction does not lie against Prince Sultan under this statute.

**7.** The venue provision of the ATA provides that:

[a]ny civil action under section 2333 of this title against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent. Process in such a civil action may be served in any district where the defendant resides, is found, or has an agent. 18 U.S.C. § 2334(a).

assertion of personal jurisdiction over him. They have not indicated, however, how official visits, or speaking engagements, or an American education, might have been connected with their cause of action. *See, e.g., Douglas Battery Mfg. Co. v. Taylor Auto Supply, Inc.*, 537 F.Supp. 1072, 1074 (M.D.N.C.1982) ("The nature and quality of defendant's contacts with North Carolina and their lack of connection with the plaintiff's cause of action convince the Court that asserting personal jurisdiction over the defendant for this cause of action would be unfair."); *Kulko v. Superior Court of California*, 436 U.S. 84, 93–94, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978) (holding that temporary visits to state insufficient basis for assertion of in personam jurisdiction over unrelated action); *Munchak Corp. v. Riko Enters., Inc.*, 368 F.Supp. 1366, 1374 (M.D.N.C.1973) (holding that unrelated activities of defendant in forum state do not constitute minimum contacts). Nor have they provided even a basic outline of how their showing of minimum contacts might be enhanced by jurisdictional discovery.[8]

Plaintiffs' principal argument, instead, is essentially that Prince Sultan brought himself within the jurisdiction of this Court (or any American court that might entertain an ATA action against him) when he "purposefully directed" his allegedly tortious activities at residents of the United States.

This jurisdictional argument invokes the Supreme Court's decisions in *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), and *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). *Calder* was brought by California residents in California state court against Florida residents who had published an allegedly libelous article in a national journal. The Supreme

Court overruled the defense of lack of personal jurisdiction, holding that "about 600,000 copies of the publication were sold in California, and that jurisdiction was proper based on the 'effects' in California of th[e defendants] Florida-based conduct." *United States v. Ferrara*, 54 F.3d 825, 828 (D.C.Cir.1995) (citing *Calder*, 465 U.S. at 785, 789–90, 104 S.Ct. 1482). The D.C. Circuit's *Ferrara* decision explained that *Calder* was based on the Supreme Court's observations

> that the defendants' allegedly tortious actions were 'expressly aimed' at California; that they knew the article 'would have a potentially devastating impact' on its subject in California; and that, under these circumstances, they should have anticipated being 'haled into court' in that State.

*Id.* (internal citations omitted).

In *Burger King*, the Supreme Court held that due process was not offended when a federal court in Florida asserted personal jurisdiction over a Michigan franchisee in a breach of contract action by a Florida franchisor, rejecting "talismanic jurisdiction formulas," 471 U.S. at 485, 105 S.Ct. 2174, but finding after a detailed factual analysis that the franchisee had established a substantial and continuing relationship with the franchisor's Miami headquarters, had received fair notice from the contract documents and the course of dealing that he might be subject to suit in Florida, and had failed to demonstrate how jurisdiction in that forum would otherwise be fundamentally unfair, *id.* at 487, 105 S.Ct. 2174.

 The sum of plaintiffs' allegations against Prince Sultan in *his personal capacity* is that he personally donated money

---

**8.** My order of July 7, 2003, indicating that discovery would be permitted on the FSIA claim as to Prince Sultan, was not informed by the briefing on the instant motions and is no longer operative.

to the IIRO, the WML, the WAMY and Al–Haramain, knowing that those foundations funded terrorist organizations including Al Qaeda. The 3AC stops well short of alleging that Prince Sultan's actions were "expressly aimed" or "purposefully directed" at the United States, allegations that might have satisfied *Burger King, supra,* and *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774–75, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984). Plaintiffs do argue that anyone whose actions have led to terrorist activity in the United States should reasonably anticipate that he might be subject to suit here whether or not he himself has targeted the United States. As Justice Brennan observed in *Burger King,* however:

> [T]he Court has consistently held that [foreseeability of causing injury in another State] is not a "sufficient benchmark" for exercising personal jurisdiction. Instead, "the foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." ". . . [I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." This "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts, or of the "unilateral activity of another party or third person."

471 U.S. at 474–75, 105 S.Ct. 2174 (internal citations omitted); *see also Wallace v. Herron,* 778 F.2d 391, 394–95 (7th Cir. 1985). It was a commercial course of dealing that made it foreseeable that Burger King's Michigan franchisee would be haled into court in Florida. Nothing like that sort of purposeful availment is alleged here.

\*　　\*　　\*　　\*　　\*　　\*

It is unnecessary to reach or decide the other arguments advanced by Prince Turki and Prince Sultan in their motions to dismiss. The claims against them for acts allegedly done in their official capacities will be dismissed for lack of subject matter jurisdiction. The claims against Prince Sultan for acts allegedly done in his personal capacity will be dismissed without prejudice for lack of personal jurisdiction. An appropriate order accompanies this memorandum.

### *ORDER*

For the reasons set forth in the accompanying memorandum, the motion to dismiss of defendant Prince Turki Al–Faisal bin Abdulaziz Al–Saud [142] is **granted**, and the claims against him will be **dismissed**; the motion to dismiss of defendant Prince Sultan bin Abdulaziz Al–Saud [110] is **granted**: the claims against him in his official capacity will be **dismissed**, and the claims against him in his personal capacity will be **dismissed without prejudice.**