Michael ASCHENBRENNER, Plaintiff,

v.

**CONSEIL REGIONAL de HAUTE–NORMANDIE, Catherine Vaudour, Patricia Blaiset, Air France, and Cosmopolitan Trucking Corporation, Defendants.**

No. 93 Civ. 7835 (MBM).

United States District Court, S.D. New York.

May 11, 1994.

582

Isidore R. Tucker, Lenore R. Tucker, New York City, for plaintiff.

Stephen M. Lazare, Lazare Potter & Giacovas, New York City, for defendants Conseil Regional de Haute–Normandie, Catherine Vaudour and Patricia Blaiset.

Francis A. Montbach, Bigham Englar Jones & Houston, New York City, for defendant Compagnie Nationale Air France.

Harold Seikel, Garden City South, NY, for defendant Cosmopolitan Trucking Corp.

## OPINION AND ORDER

MUKASEY, District Judge.

Defendants Conseil Regional de Haute–Normandie (the "Conseil"), Catherine Vaudour, and Patricia Blaiset (collectively, the "Conseil Defendants") move to dismiss all claims against them—including plaintiff Michael Aschenbrenner's claims and defendants Compagnie Nationale Air France[1] and Cosmopolitan Trucking Corporation's cross-claims—for lack of subject matter jurisdiction, lack of personal jurisdiction, and *forum non conveniens*. For the reasons discussed below, the Conseil Defendants motions to dismiss are granted.

### I.

The following facts are alleged by plaintiff. Aschenbrenner is a New York-based artist. (Complt. ¶ 1) In March 1991, Vaudour travelled to New York and solicited Aschenbrenner's participation in an exhibition of contemporary international glasswork (the "Exposition") that the Conseil was planning to hold in Rouen, France. (Complt. ¶¶ 8–9) In April 1991, and on a return trip to New York in May 1991, Vaudour made arrangements for the inclusion of two of Aschenbrenner's works in the Exposition. (Complt. ¶ 10–13). The works were titled "Damaged Bone Series" and "Boneyard," respectively, and each consisted of 15 to 25 component sculptures. (Complt. ¶ 13) In accordance with arrangements made by the Conseil Defendants, Aschenbrenner shipped the works to Rouen, where they arrived undamaged in December 1991 and were exhibited at the Exposition from December 18, 1991 to February 29, 1992. (Complt. ¶¶ 13, 16, 34–35) After the Exposition closed, the Conseil Defendants sent Aschenbrenner's works of art back to New York via Air France and Cosmopolitan Trucking. (Complt. ¶¶ 18–19, 36, 38, 52, 54) The Conseil Defendants' role included arranging the packing, shipping, and insurance coverage. (Complt. ¶ 18) In late April 1992, the works arrived at Aschenbrenner's New York residence severely broken. (Complt. ¶¶ 20, 29, 39, 47, 55, 63) The damage—valued by plaintiff at $94,175—was caused by improper and negligent packing, shipping or handling. (Complt. ¶¶ 20, 30, 39, 43, 47–48, 55, 59, 63–64).

Because the Conseil Defendants' motion challenges this court's jurisdiction, it is proper to rely on affidavits in addition to the pleadings. *Kline v. Kaneko*, 685 F.Supp. 386, 389 (S.D.N.Y.1988). The following uncontroverted facts are supported by sworn statements submitted by the parties. The Régional de Haute–Normandie ("Normandy") is a territorial subdivision of France. (Rufenacht Decl. ¶ 2) Under French law, the people of Normandy elect the Conseil to govern the region. (Vaudour Decl. ¶ 3; Rufenacht Decl. ¶ 4) French law provides further that the Conseil is "competent to promote the economic, social, health, cultural and scientific development" of Normandy. (Rufenacht Decl. ¶ 5 & Exh. A) "Under this provision, the French view the organization and control of museums and similar cultural activity as being within the exclusive prov[i]nce of the French government." (Rufenacht Decl. ¶ 5) Normandy's budget "is

---

1. Air France has taken the position that the Conseil Defendants' first motion to dismiss "is not addressed to Air France." (Air France 1/14/94 Ltr.) This position is squarely contradicted by the relevant Notice of Motion, in which the Conseil Defendants announced their intent to move this court "for an order dismissing Plaintiff's Complaint and Defendant Air France's Cross-Claim against the [Conseil] Defendants." (Conseil Def. 12/22/93 Notice of Motion at 1).

generated through taxes, loans and other governmental subsidies." (Rufenacht Decl. ¶ 3) While engaged in the activities underlying plaintiff's claims against them, Vaudour and Blaiset were acting on behalf of the Conseil. (Vaudour Decl. ¶ 4; Rufenacht Decl. ¶¶ 6–10)

The Exposition was a not-for-profit event, the "sole purpose" of which was to "promote education, the arts and culture." (Vaudour Decl. ¶ 7) The participating artists were not paid to exhibit their works. (Vaudour Decl. ¶ 8) The Conseil Defendants "had no pecuniary or other interest in[ ] the sale or placement of any work." (Vaudour Rep.Decl. ¶ 4) The Exposition charged members of the public a "nominal" admission fee of 15 francs (about US $2.50), but extended free admission to soldiers and students. (Vaudour Decl. ¶ 8) Over-all, the Conseil lost more than 3.2 million francs on the Exposition. (Vaudour Rep.Decl. ¶ 6)

In an "explanatory brochure" (Vaudour Rep.Decl. ¶ 5) furnished to potential participants in the Exposition (Aschenbrenner Aff. ¶ 12), the Conseil explained its rules regarding the "[s]ale of works" during the Exposition. This brochure provides:

The eventual sale of works will not be directly negotiated during the exhibition. However:

· Potential buyers may, with the authori[z]ation of the artists and/or that of the galleries representing them, obtain the contact details of the artists concerned.

· Purchase orders have already been received from patrons of the arts and public bodies for selected works from the exhibition.

· Every attention will be given, further [sic] to the artists' agreement, to finding a new owner for their works after the exhibition.

(Aschenbrenner Aff.Exh. 2) In addition, the Conseil apparently had a policy[2] of providing pricing information to potential purchasers of exhibited works upon request if the artist provided the information to the Conseil and authorized the Conseil to disclose it. (Vaudour Rep.Decl. ¶ 3)

When Vaudour first visited Aschenbrenner in March 1991 to discuss his participation in the Exposition, he also agreed to provide photographs of his works for a book on contemporary glass art that she was preparing. (Aschenbrenner Aff. ¶ 6) The precise link between this book and the Exposition is unclear. The explanatory brochure mentioned above sends mixed signals about the relationship between the book and the Exposition. The section of the brochure which discusses the book—and is entitled "Catalogue"—states that the "book does not constitute the exhibition catalogue." (Aschenbrenner Aff. Exh. 2) The brochure continues: "Works figuring in the album are not necessarily those exhibited. Similarly, certain artists not present at the exhibition may be present in the book." (Aschenbrenner Aff.Exh. 2) On the other hand, the brochure states that the book was to be sold during the Exposition, that "[p]hotographs should illustrate: Where possible the work or works proposed for the exhibition," and that "[p]hotographs supplied should carry the following statement: 'Publication authori[z]ed for the 1991–1992 Contemporary Glasswork Art Exhibition.' " (Aschenbrenner Aff.Exh. 2)

A tie between the Exposition and Vaudour's book is reflected also in forms returnable to "Catherine VAUDOUR" signed by Michael Aschenbrenner, on which the artist was asked, "Is the name of the lender authori[z]ed for publication in the book and in the exhibition?" and "Does the photographer authori[z]e the use of the photograph(s) in the book which is to accompany the exhibition?" (Vaudour Decl.Exh. A) Regardless of any

---

**2.** In her declaration, Vaudour states:

Of course, it is the objective of nearly all artists to sell their work in order to make a living. Thus, some of the artists sent pricing information with their work *in case* somebody expressed an interest in purchasing it. If, in fact, somebody approached a Conseil representative about purchasing one of the pieces, the Conseil

would only provide such information *if* the artist authorized us to do so.

(Vaudour Rep.Decl. ¶ 3) I interpret Vaudour's use of the conditional tense, rather than the past tense, in the last clause as a sign that she is describing the Conseil's policy, and not necessarily its practice, during the Exposition.

584

intended link between the book and the Exposition, the book was "ultimately dissociated from the Exposition," and was not completed until January 1993, almost one year after the Exposition closed. (Vaudour Rep.Decl. ¶ 7)

Apart from these uncontroverted facts, there is a dispute between two of the affiants over whether Vaudour promised to assist in the sale of pieces exhibited at the Exposition. Aschenbrenner alleges that in March 1991, Vaudour told him "the Exposition would be well advertised to attract tourists and art collectors from around the world, that advertising was to be placed in magazines, newspapers and through personal invitations, that she would attempt to sell to collectors the pieces exhibited before the end of the Exposition, and that she would try to place exhibited works into galleries for purposes of sale." (Aschenbrenner Aff. ¶ 9) Vaudour responds that "Aschenbrenner's suggestion that I promised to 'attempt to sell to collectors the pieces exhibited' and to 'place exhibited works in galleries for purposes of sale' is simply false." (Vaudour Rep.Decl. ¶ 2) Regardless of which affiant is recalling accurately Vaudour's own statements to Aschenbrenner, it is evident from the Exposition brochure quoted above that the Conseil itself represented that it would give "every attention" to "finding a new owner" for Aschenbrenner's works after the Exposition.

## II.

▮ The Conseil Defendants argue that the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. §§ 1602–1611, which provides the exclusive basis for jurisdiction over foreign states, *Saudi Arabia v. Nelson,* — U.S. ——, ——, 113 S.Ct. 1471, 1476, 123 L.Ed.2d 47 (1993), does not support subject matter jurisdiction over the claims against the Conseil Defendants. (Conseil Def.Mem. at 8–14; Conseil Def.Rep.Mem. at 3–10) Under the FSIA, a foreign state—including "a political subdivision of a foreign state or an agency or instrumentality of a foreign state," 28 U.S.C. § 1603(a)—is immune from the jurisdiction of courts in the United States unless the action falls within one of the statute's enumerated exceptions. 28 U.S.C.

§ 1604. The exception relevant to this action provides that:

A foreign state shall not be immune from jurisdiction of courts of the United States . . . in any case—

\* \* \* \* \* \*

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States . . .

28 U.S.C. § 1605(a)(2). Although plaintiff argues that Vaudour and Blaiset are not entitled to the protection of the FSIA to the extent they were not acting in their official capacities (Pl.Opp.Mem. at 3), he has not controverted the evidence that Vaudour and Blaiset were, at all relevant times, acting solely in their official capacity. (Rufenacht Aff. ¶¶ 6–10)

▮ The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act," adding that the "commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). The circularity of this definition limits its utility. However, the Second Circuit has restricted the test of "commercial activity" by stating that "[t]he court must inquire whether the activity is of the type an individual would customarily carry on for profit." *Morel de Letelier v. Republic of Chile,* 748 F.2d 790, 797 (2d Cir.1984) (citing, among other cases, *United States v. County of Arlington, Va.,* 702 F.2d 485, 488 (4th Cir.1983)), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985); *accord Polanco v. Dominican Republic,* 1991 WL 146306 (S.D.N.Y. July 22, 1991); *Kline,* 685 F.Supp. at 391. Whatever test I might be inclined otherwise to apply, that is the governing test in this Circuit.

In addressing the "commercial" nature of the Exposition, the Conseil Defendants argue that it was analogous to a non-profit museum exhibition (Conseil Def.Mem. at 10), whereas Aschenbrenner argues that it was more closely analogous to a for-profit art gallery show (Pl.Opp.Mem. at 5). In fact, the Exposition had features of both. The nominal admission fee, the absence of direct negotiations over sales of the exhibited works, and the Conseil Defendants' lack of any financial interest in any eventual sales were characteristic of a museum exhibition. In contrast, the Conseil's expressed willingness to assist the artists in finding buyers for their works was a commercial aspect more characteristic of an art gallery show. Taken as a whole, the Conseil Defendants' activities in staging the Exposition were not of a type that a private entity would carry on for profit. Despite the Conseil Defendants' pledge to help promote the artworks commercially, the Exposition was essentially educational and cultural, and the Conseil Defendants were in no position to gain financially from any sales they may have facilitated. Thus, the Exposition was more closely analogous to a publicly-sponsored, not-for-profit art exhibition than to a private, for-profit gallery show or auction.

■ It bears emphasis that my conclusion that the Exposition was not a commercial activity does not rest on the organizers' lack of a profit motive. The FSIA's express command that the "commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose," 28 U.S.C. § 1603(d), forecloses such reasoning. Rather, my conclusion rests on the dissimilarity between how the Exposition was organized and presented—particularly the lack of any financial transactions between the Conseil and the artists—and how a typical profit-seeking project is organized and presented. Although the distinction between a profit motive and a resemblance to profit-seeking activities may seem abstruse, it is a distinction inherent in the test for commercial activity employed in the Second Circuit—namely, that a commercial activity is one "of the type an individual would customarily carry on for profit."

■ ■ In addition, Aschenbrenner argues that the publication of Vaudour's book was a commercial activity. (Pl.Opp.Mem. at 5) The book was slated to "be on sale in all French-language bookshops" (Aschenbrenner Aff. Exh. 2), and its publication was likely a "commercial activity." However, the FSIA requires that the acts which the claims are "based upon" be undertaken "in connection with" a commercial activity, 28 U.S.C. § 1605(a)(2), and Aschenbrenner has not articulated any connection between the publication of Vaudour's book and the acts underlying the claims against the Conseil Defendants—namely, the shipment of Aschenbrenner's sculpture from France to New York. Aschenbrenner contributed to Vaudour's book by allowing photographs of his sculptures to be included in the book. (Aschenbrenner Aff. ¶ 6 & Exhs. 3, 4) But there is no allegation, much less evidence, that the sculptures were in France in order to be photographed for the book, or that their presence in France was otherwise induced by Aschenbrenner's opportunity to have photographs of his sculptures appear in the book. On the contrary, Aschenbrenner states twice in his legal memorandum that the Conseil Defendants borrowed his sculptures for display at the Exposition (Pl.Opp.Mem. at 6, 7), saying nothing about the Conseil Defendants borrowing the sculptures for reasons related to preparing Vaudour's book. In fact, the documentary materials Aschenbrenner submitted to this court show that participation in the book was not necessarily conditioned on participation in the Exposition (Aschenbrenner Aff.Exh. 2) and that Aschenbrenner's participation in the book project was not solicited in writing until after the Exposition had closed. (Aschenbrenner Aff. ¶ 13 & Exh. 4 (document dated March 30, 1992); Vaudour Rep.Decl. ¶ 8) Moreover, Vaudour states that "[t]he book had nothing to do with Mr. Aschenbrenner's participation in the Exposition." (Vaudour Rep.Decl. ¶ 7)

■ The evidence before this court establishes, at most, some connection between the Exposition and the book. I decline to hold that any act connected in any way to the Exposition is necessarily connected to the

book solely on the basis of a connection between the Exposition and the book. As the facts of this case illustrate, doing so would expand the concept of connectedness, as used in the FSIA, to encompass highly indirect and remote connections and thereby render the FSIA's "in connection with" requirement virtually meaningless. Therefore, the commercial nature of Vaudour's book is irrelevant to the present motion.

For the foregoing reasons, the claims of plaintiff and the cross-claims of Defendants Air France and Cosmopolitan Trucking against the Conseil Defendants are dismissed.