Leonard MALEWICZ, et al. Plaintiffs,

v.

CITY OF AMSTERDAM Defendant.

No. CIV.A. 04–0024(RMC).

United States District Court,
District of Columbia.

March 30, 2005.

Harvey Joseph Volzer, Shaughnessy, Volzer & Gagner, PC, Jennifer L. Spina, L. Eden Burgess, Thomas R. Kline, Andrews Kurth LLP, Washington, DC, Amelia Jane Keuning, Howard Neil Spiegler, Lawrence M. Kaye, Herrick, Feinstein LLP, New York City, for Plaintiffs.

Christopher M. Curran, White & Case LLP, Samuel C. Kaplan, U.S. Department of Justice, Washington, DC, for Defendants.

## MEMORANDUM OPINION

COLLYER, District Judge.

This lawsuit attempts to correct an alleged wrong committed by the City of Amsterdam, a political subdivision of the Kingdom of the Netherlands, when it expropriated eighty-four (84) works of art created by Kazimir Malewicz. Brought by heirs of Mr. Malewicz, who died in 1935, (the "Malewicz Heirs") the suit arises in replevin, rescission and conversion and seeks the return of the artwork as well as damages. The first question is whether this Court has jurisdiction to hear the merits of the complaint. Having before it a fully-briefed motion to dismiss on jurisdictional grounds, and a Statement of Interest filed by the United States to which both parties have filed responses, the Court concludes that it cannot determine on this record whether the City of Amsterdam's contacts with the United States

were "substantial" within the meaning of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1603(e), to support jurisdiction.

## I. BACKGROUND

### A. The Malewicz Collection

Kazimir Malewicz was a world-renowned Russian artist in the years before World War II; "[h]e founded the Suprematist Movement, which had an enormous influence on abstract art." [1] Mr. Malewicz took more than one hundred of his works of art to Berlin for exhibition in 1927. [2] Am. Compl. ¶ 8. When he had to return unexpectedly to Russia, he entrusted his art pieces to four friends in Germany: Gustav von Riesen, Hugo Häring, Hans Richter, and Dr. Alexander Dorner. When the exhibition closed, the art works were packed in crates and shipped to Dr. Dorner for safekeeping and storage since they could not safely be returned to Russia because "Stalinist condemnation of abstract art would undoubtedly have led to their confiscation and destruction." Id. ¶ 9.

The art works were stored in the basement of the Landesmuseum in Hannover, Germany, of which Dr. Dorner was the director. Id. ¶ 10. Alfred Barr, then-director of the Museum of Modern Art in New York ("MoMA"), visited Dr. Dorner in 1935 and persuaded him to ship some of the works to MoMA to be held on loan. Id. Kazimir Malewicz died in May of 1935. Id. ¶ 13. Dr. Dorner fled Nazi Germany in 1937, taking two other works by Mr. Malewicz with him. Id. ¶ 11. Because the Malewicz works would not have been acceptable for display to the governments of either Russia or Germany, Dr. Dorner sent the crates of Malewicz paintings and drawings to Mr. Häring who, alone of the original group of friends, remained in Berlin, Germany. Id. ¶ 13. Mr. Häring safeguarded the works in Berlin until that city was bombed in 1943, and then removed them to his native town, Biberach. Id. Mr. Häring died in Biberach in 1958. Id.

Dr. Dorner died in November 1957. He bequeathed the two Malewicz works that he had taken out of Germany to the Busch–Reisinger Museum at Harvard University in Cambridge, Massachusetts, to be held on loan and for the benefit of "the rightful owners." Id. ¶ 11. Upon demand from the Malewicz Heirs, MoMA has resolved their demands by returning one of the Malewicz works and the Busch–Reisinger Museum returned both works to the Heirs. Id. ¶ 12.

The Malewicz Collection at issue is housed, when not on exhibit elsewhere, at the Stedelijk Museum in Amsterdam. Id. ¶ 6. Between the years of 1951 and 1956, Dr. W.J.H.B. Sandberg, then-director of the Stedelijk, and other museum directors, tried to persuade Mr. Häring to send the Malewicz Collection to the Stedelijk for restoration and exhibition. Id. ¶ 15. Mr. Häring refused to do so and repeatedly "emphasized that he was only a custodian of the works, responsible for their safekeeping and that he had no right to convey ownership of them to anyone." Id. Mr. Häring took the same position with anyone who attempted to purchase any works from the Malewicz Collection. When Mr. Sandberg attempted to acquire a Malewicz painting that Mr. Häring had loaned for an exhibition at the Stuttgart Staatsgalerie, he was advised that Dr. O. Domnick of

1. Memorandum of Points and Authorities, in Support of the City of Amsterdam's Motion to Dismiss the Amended Complaint in Its Entirety ("Def.Mem."), Ex. 3, Declaration of Geurt Imanse ("Imanse Decl."), ¶ 3.

2. The facts are hereafter taken from Plaintiffs' Amended Complaint.

Domnick Verlag of Stuttgart had attempted to buy a Malewicz painting, but that Mr. Häring had refused to sell it, declaring "that he could not sell it to me because he is not the owner and only considers himself to be the trustee of the Malewicz works." *Id.* ¶ 16. Mr. Sandberg visited Mr. Häring in a hospital in Biberach in February 1956, where Mr. Häring "was recovering from many illnesses." *Id.* ¶ 19. Mr. Häring explained again that "he was not the owner and that therefore he could not sell anything." *Id.* This time, however, Mr. Häring finally agreed to lend the works to the Stedelijk. *Id.*

Mr. Sandberg prepared a short proposal stating the terms of the contemplated loan of the Malewicz Collection, which he left with Ms. Margot Aschenbrenner, Mr. Häring's trusted secretary. *Id.* ¶¶ 19, 20. The note read:

### Proposal of Mr. Sandberg, Director, Stedelijk Museum, Amsterdam

Mr. Hugo Häring suggested to me that the pictures and studies by Kazimir Malewicz in his possession should be made available against an annual annuity of DM 12,000. At the moment it is not possible to guarantee such an annuity over a period of many years because the people expected to contribute to it are not sufficiently familiar with the collection. For that reason, may I suggest that the collection initially be lent to the Stedelijk Museum in Amsterdam for a year for purposes of exhibition in various other museums, with an option for extending it for further years.

For this purpose, I would guarantee DM 12,000.—to Mr. Hugo Häring for this year (the first payment of DM 4,000.— would take place immediately as soon as the pictures are sent to Amsterdam). During said year we would make Malewicz's work well-known and thus glean the possibility of guaranteeing a similar annuity to Mr. Hugo Häring for further years.

Dated: Biberach, February 29, 1956
signed: Sandberg
Director, Stedelijk Museum Amsterdam

*Id.* ¶ 20.

The response sent by Ms. Aschenbrenner, dated May 8, 1956, for the first time suggested the possible sale of the Malewicz Collection for DM 120,000 (less the sum of annual rental payments made during the loan period). Mr. Sandberg readily agreed to the terms of the loan but, by letter dated June 4, 1956, he asked, "On what conditions can we purchase the collection since Mr. Häring can transfer possession but not ownership. 'Nemo plus juris in alium transferre potest quam ipse habet.' [One cannot transfer to another a right which he has not.]." *Id.* ¶ 22. In response, a letter dated June 23, 1956, signed "on behalf of" Mr. Häring but not by him, "announced that, under German law, ownership of the Malewicz works had passed to Häring in 1955; that Häring had in his possession a 'notarial exposition' of his acquisition of ownership based on a purported gift *causa mortis* by Malewicz to Häring of the works left in Berlin; and that Häring thus had the power to sell the works to Amsterdam." *Id.* ¶ 27. Plaintiffs' amended complaint alleges that these documents were obvious frauds and were known by Mr. Sandberg to be frauds because of his prior direct conversations with Mr. Häring, who never claimed that Mr. Malewicz intended to transfer the collection to Mr. Häring upon Mr. Malewicz's death. *Id.* ¶¶ 29—34.

Based on these communications, however, the City of Amsterdam, through Mr. Sandberg and other representatives, entered into a loan contract with Mr. Häring in November 1956 that contained an option to purchase the Malewicz Collection. *Id.*

¶ 35. "[T]hereafter, in 1958, [the City] purported to exercise that option in the face of its awareness that Häring had no authority to convey title and that he had consistently denied that he had any such authority ...." *Id.* The amended complaint further alleges that Amsterdam and the Stedelijk concealed the nature of the acquisition of the Malewicz Collection in its Annual Report for 1958, in catalogues on the collection, and through a lack of customary publicity for this kind of acquisition. *Id.* ¶¶ 36, 37, 38.

"It took several years after the fall of the Iron Curtain for all of Malewicz's living heirs to locate and contact each other and begin the difficult process of recovering the family's property ...." *Id.* ¶ 42. Plaintiffs comprise the 35 living heirs of Kazimir Malewicz, two of whom are citizens of the United States and none of whom resides in, or is a citizen of, The Netherlands. *Id.* ¶ 1. The Malewicz Heirs first asked Amsterdam to return the Malewicz Collection to them in 1996. *Id.* ¶ 42. A formal response from Amsterdam in September 2001 stated that:

> its purported acquisition of the Malewicz Collection was valid and that it became the owner of the Malewicz Collection at that time, but that if this were not so, it nevertheless became the owner on January 1, 1993, through acquisitive prescription under Article 3:105 of the Dutch Civil Code in connection with Article 93 of the Transitory Act.

*Id.* ¶ 40. The Malewicz Collection continues to be housed at the Stedelijk.

### B. The Malewicz Collection in the United States

Fourteen of the eighty-four pieces in the Malewicz Collection were exported to the United States in 2003 to be part of a temporary exhibition of artwork at the Solomon R. Guggenheim Museum in New York City (from May 22, 2003 until September 7, 2003) and the Menil Collection in Houston (from October 2, 2003 until January 11, 2004). Def. Mem. at 4. These exhibitions were arranged under the terms of the Mutual Educational and Cultural Exchange Program administered by the U.S. Department of State ("State Department"). *See* 22 U.S.C. Chapter 33; Statement of Interest of the United States ("U.S.Statement") at 1. Following a request by Amsterdam that the artwork be granted immunity from legal process while in this country, and an objection filed by counsel for the Malewicz Heirs, the State Department determined that the objects were of cultural significance and that their temporary exhibition was in the national interest. *See* 68 Fed.Reg. 17852–01, April 11, 2003. The State Department therefore granted immunity from seizure to the 14 Malewicz pieces. U.S. Statement at 1. Pursuant to 22 U.S.C. § 2549, these artworks were immune from seizure and other forms of judicial process that might have had the purpose or effect of depriving the Guggenheim or the Menil Collection (or any carrier) of custody or control of the artworks while in this country.

The Malewicz Heirs filed this action two days before the exhibit in Houston closed. The artwork was returned to Amsterdam in accordance with the prearranged schedule, and before Amsterdam was served with notice of this suit. Def. Mem. at 4; Def. Reply at 4.

The City of Amsterdam filed a motion to dismiss the complaint on April 30, 2004. That motion became ripe after full briefing on September 24, 2004. However, the United States filed a Notice of Possible Interest on November 15, 2004 and then a Statement of Interest on December 22, 2004. The Malewicz Heirs and the City of Amsterdam filed responses to the U.S. Statement on January 24, 2005 and Febru-

ary 16, 2005, respectively. The United States subsequently filed a Supplemental Statement of Interest on March 17, 2005. The matter is now ready for decision.

## II. STATUTORY PROVISIONS

Certain statutory provisions of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602 *et seq.*, and the Immunity from Seizure Act, 22 U.S.C. § 2459(a), are critical to the analysis of the Court's jurisdiction. These will be reproduced for ease of reference:

The purposes of FSIA are set out at 28 U.S.C. § 1602:

The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts. Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities. Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter.

Definitions under FSIA are provided at 28 U.S.C. § 1603:

For purposes of this chapter -

(a) A 'foreign state,' except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

(b) An 'agency or instrumentality of a foreign state' means any entity -

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States . . . nor created under the laws of any third country.

. . . . .

(d) A 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

(e) A 'commercial activity carried on in the United States by a foreign state' means commercial activity carried on by such state and having substantial contact with the United States.

Sovereign immunity to foreign states is guaranteed by 28 U.S.C. § 1604:

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act[,] a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

However, foreign sovereign immunity will be deemed waived (or, more precisely, the comity of recognizing foreign sovereignty will not be extended) if the conditions at 28 U.S.C. § 1605 are met:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case -

. . . . .

(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; ....

The foreign owner of works of art who is willing to have them exhibited by a museum in this country can, under specified circumstances, obtain immunity from any court process that would interfere with the custody or control of the foreign works while in the hands of the American institution, as provided by 22 U.S.C. § 2459:

(a) Whenever any work of art or other object of cultural significance is imported into the United States from any foreign country, pursuant to an agreement entered into between the foreign owner or custodian thereof and the United States or one or more cultural or educational institutions within the United States providing for the temporary exhibition or display thereof within the United States at any cultural exhibition, assembly, activity, or festival administered, operated, or sponsored, without profit, by any such cultural or educational institution, no court of the United States, any State, the District of Columbia, or any territory or possession of the United States may issue or enforce any judicial process, or enter any judgment, decree, or order, for the purpose or having the effect of depriving such institution, or any carrier engaged in transporting such work or object within the United States, of custody or control of such object if before the importation of such object the President or his designee has determined that such object is of cultural significance and that the temporary exhibition or display thereof within the United States is in the national interest, and a notice of that effect has been published in the Federal Register.

### III. LEGAL STANDARDS

A motion to dismiss should not be granted unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994). The threshold determination in resolving a motion to dismiss is not whether the plaintiff will ultimately prevail, but whether he or she is entitled to offer evidence to support his or her claims. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds, Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, which governs motions to dismiss for lack of subject matter jurisdiction, Plaintiffs bear the burden of establishing by a preponderance of the evidence that the Court possesses jurisdiction. *See Shekoyan v. Sibley Int'l Corp.*, 217 F.Supp.2d 59, 63 (D.D.C.2002); *Pitney Bowes, Inc. v. United States Postal Serv.*, 27 F.Supp.2d 15, 19 (D.D.C.1998). It is well established that, in deciding a motion to dismiss for lack of subject matter jurisdiction, a court is not limited to the allegations set forth in the complaint, "but may also consider material outside of the pleadings in its effort to determine whether the court has jurisdiction in the case." *Alliance For Democracy v. Federal Election Com'n*, 2005 WL 503729, at *3 (D.D.C. March 4, 2005); *see Lockamy v. Truesdale*, 182 F.Supp.2d 26, 30–31 (D.D.C.2001).

"Generally in entertaining a motion to dismiss, a district court must accept the allegations of the complaint as true, and

construe all inferences in the plaintiff's favor. However, '[w]here the motion to dismiss is based on a claim of foreign sovereign immunity, which provides protection from suit and not merely a defense to liability, ... the court must engage in sufficient pretrial factual and legal determinations to satisfy itself of its authority to hear the case before trial.'" *Burnett v. Al Baraka Inv. and Devel. Corp.*, 292 F.Supp.2d 9, 14 (D.D.C.2003)(internal citations omitted). Accordingly, the court must look beyond the parties' pleadings to resolve any factual disputes that are essential to its decision to retain jurisdiction or dismiss the action. *See id.* (citing *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C.Cir.2000)); *Price v. Socialist People's Libyan Arab Jamahiriya*, 274 F.Supp.2d 20, 24 (D.D.C.2003).

## IV. ANALYSIS

■■ The City of Amsterdam is clearly a "political subdivision" of The Kingdom of the Netherlands and is therefore a "foreign state" within the meaning of FSIA, 28 U.S.C. § 1603. FSIA is the "sole basis for obtaining jurisdiction over a foreign state in our courts." *Republic of Austria v. Altmann*, 541 U.S. 677, 124 S.Ct. 2240, 2253, 159 L.Ed.2d 1 (2004) (citation omitted); *see also Millen Industries, Inc. v. Coordination Council*, 855 F.2d 879, 884 (D.C.Cir.1988)("FSIA is the exclusive means of exercising jurisdiction over the foreign sovereigns ...."). The City is therefore "immune from the jurisdiction of the courts of the United States," 28 U.S.C. § 1604, unless one of the FSIA statutory exceptions applies. "These exceptions are central to the Act's functioning: 'At the threshold of every action in a district court against a foreign state, ... the court must satisfy itself that one of the exceptions applies,' as 'subject-matter jurisdiction in any such action depends' on that application." *Altmann*, 124 S.Ct. at 2249 (*quot-*

*ing Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493–94, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983)).

■ The exception upon which the Malewicz Heirs rely, 28 U.S.C. § 1605(a)(3), allows a suit against a foreign sovereign when (1) rights in property were taken in violation of international law, (2) the property is present in the United States, and (3) the property has a connection to a commercial activity in the United States conducted by the foreign state. *See* 28 U.S.C. § 1605(a)(3). The City of Amsterdam moves to dismiss, in part because it argues that none of these three factors under § 1605(a)(3) can be met. These arguments will be examined in turn. As the Defendant here, the City "bears the burden of proving that the plaintiff[s]' allegations do not bring [their] case within a statutory exception to immunity." *Phoenix Consulting*, 216 F.3d at 40 (citations omitted). Because the City challenges only the legal sufficiency of the allegations in the amended complaint, the factual allegations must be taken as true for the purpose of ruling on the motion to dismiss. *Id.*

### A. Violation of International Law

■ The City argues that the Malewicz Heirs cannot claim an expropriation in violation of international law in this Court because they have failed to exhaust their remedies in the courts of The Netherlands. The City essentially concedes that a taking without compensation violates international law. *See Crist v. Republic of Turkey*, 995 F.Supp. 5, 10–11 (D.D.C.1998) ("An expropriation is a violation of international law if the taking ... does not provide for just compensation. At the jurisdictional stage, a court is not required to determine whether a taking or expropriation actually violated international law. The claim must

merely be substantial and non-frivolous to provide a sufficient basis for jurisdiction") (citations omitted). However, "[a]s a threshold matter, a claimant cannot complain that a 'taking' or other economic injury has not been fairly compensated, and hence violates international law unless the claimant has first pursued and exhausted domestic remedies in the foreign state that is alleged to have caused the injury." *Millicom International Cellular v. Republic of Costa Rica,* 995 F.Supp. 14, 23 (D.D.C.1998); *see also Altmann,* 124 S.Ct. at 2262–2263 (Breyer, J., concurring)("A plaintiff who chooses to litigate in this country in disregard of the postdeprivation remedies in the 'expropriating' state may have trouble showing a 'tak[ing] in violation of international law.' ").

The Malewicz Heirs threatened to sue the City in the courts in The Netherlands and even presented the City with a draft writ of summons to commence such an action. Def. Mem., Attach. L, Declaration of W.D.T.D. Wiarda, Attorney for the City of Amsterdam ("Wiarda Decl.") ¶ 5; *see* Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss Plaintiffs' Amended Complaint ("Pls.' Opp.") at 28 ("[T]he Heirs had prepared a draft Dutch writ and shared it with Defendant in February 2001."). There is no doubt about the general adequacy of the legal system in The Netherlands to address the Plaintiffs' claims. *See Evolution Online Sys., Inc. v. Koninklijke Nederland N.V., et. al,* 41 F.Supp.2d 447, 451–52 (S.D.N.Y.1999)(concluding that The Netherlands provides an adequate alternative to a U.S. forum); Pls.' Opp. at 28 ("Plaintiffs do not dispute that Defendant is subject to the jurisdiction of the Dutch courts, Plaintiffs' claims have counterparts under Dutch law [and] . . . the Dutch legal system is well-developed, fair and independent . . . ."). Nonetheless, Plaintiffs have not filed suit in The Netherlands, which,

according to the City, dooms their lawsuit here.

The Malewicz Heirs counter the City's argument with two of their own. First, they contend that exhaustion of local remedies is not required because the remedies available in the courts of The Netherlands are clearly inadequate. *See Millicom,* 995 F.Supp. at 23. In addition, Plaintiffs argue that the exhaustion requirement is not applicable in this instance because their "claim is for injury for which the respondent state firmly denies responsibility." *McKesson Corp. v. Islamic Republic of Iran,* 1997 WL 361177, at *15 n. 25, 1997 U.S. Dist. LEXIS 8903, at *53 n. 25 (D.D.C. June 23, 1997).

### 1. Clearly Inadequate Remedies

■ The Malewicz Heirs contend that the City cannot establish that this case should be dismissed where the alternate forum (a Dutch court) does not provide an adequate alternative remedy. Plaintiffs' argument as to the adequacy of the remedies available in Dutch courts concerns the arguably applicable Dutch statute of limitations. *See* Pls.' Opp. at 30 ("Defendant intends to raise the statute of limitations and argue that it is a complete defense if this action is brought in the Netherlands.").

■ The fact that an alternative forum provides a more limited recovery than a plaintiff's forum of choice does not automatically make the alternative forum inadequate. *Mutambara v. Lufthansa German Airlines,* 2003 WL 1846083, at *4 (D.D.C. Mar. 24, 2003) (citations omitted). However, "an alternative forum in which the plaintiff can recover *nothing* for a valid claim is not adequate." *Id.* (emphasis added). This is certainly the case when the statute of limitations in the alternative forum would bar a plaintiff's claims. *Mills*

*v. Aetna Fire Underwriters Insurance Co.,* 511 A.2d 8, 13 (D.C.App.1986)("Another tribunal cannot be considered available to a plaintiff if his cause of action would be barred there by the statute of limitations."); *see also Crimson Semiconductor, Inc. v. Electronum,* 629 F.Supp. 903, 909 (S.D.N.Y.1986)(noting that the statute-of-limitations bar in Romania made the foreign forum "clearly unsatisfactory.").

Under the law of the District of Columbia, this Court may not require Plaintiffs to take their case to a Dutch court unless the City of Amsterdam waives its statute-of-limitations defense and the Dutch court accepts that waiver. *See Mills,* 511 A.2d at 13. ("In the interest of justice, a court must retain such a case, no matter how inappropriate the forum may be, unless the [foreign] court accepts the defendant's stipulation that he will not raise the defense of statute of limitations in the proposed alternative forum.") (citations omitted). The current record is factually insufficient for this Court to determine when the Dutch statute of limitations began to run, and whether it will ultimately bar Plaintiffs' claims. However, if the statute of limitations in the Netherlands would preclude this suit, the Court must not require the Malewicz Heirs to file there. Given the disposition of this matter, it is not necessary to determine how to proceed on this point because the Court must first determine whether the other relevant factors would independently bar jurisdiction here.

### 2. State Denial of Responsibility

■ Plaintiffs also argue that they are not required to file suit in the Dutch courts because the City has "denied any responsibility to the Heirs for their claims." Pls.' Opp. at 5. They rely on *McKesson Corp.* for the proposition that the requirement of local exhaustion of remedies does not ap-

ply "when the claim is for injury for which the respondent state firmly denies responsibility." 1997 WL 361177, at *15 n. 25, 1997 U.S. Dist. LEXIS 8903, at *53 n. 25 (quotation omitted). In *McKesson Corp.,* an American corporation claimed that the Islamic Republic of Iran had expropriated its interests in a dairy in Iran after the Islamic Revolution by, *inter alia,* not paying dividends. Of particular significance to that case was the fact that the actions that led to the expropriation could "be attributed beyond doubt to the State." *Id.* at 1997 WL 361177, *11, 1997 U.S. Dist. LEXIS 8903, *40 (*quoting* the Tribunal Award (Iran–United States Claims Tribunal, 1986)). Thus, the Court's statement that "Iran firmly denies responsibility for the claims asserted by McKesson" referred directly to the state of Iran (the Islamic Republic of Iran) and not only to its agent, the board of directors of the dairy. Iran had denied responsibility by claiming that the dairy's board of directors had made the decisions—not the state.

Nothing even remotely similar has happened here. Although The City of Amsterdam has denied that it violated the rights of the Malewicz Heirs, it does not deny "responsibility" for the acquisition of the Malewicz Collection. Thus, the City's "denial" is in the nature of a legal defense only, which is very different from Iran's pretense of not having been an actor in the drama at all. The Court finds that the City of Amsterdam has not denied responsibility for its actions but has only denied the alleged illegality of them. This is not a reason to doubt the efficacy of Dutch courts.

Because the Dutch statute-of-limitations might bar this suit in The Netherlands, the City's arguments concerning exhaustion of remedies are not a basis for dismissing this suit on jurisdictional grounds.

## B. Present in the United States

 The 14 Malewicz works at issue here were temporarily present in the United States for exhibition at the Guggenheim and the Menil Collection. They were shipped back to Amsterdam when the second exhibition closed and actually left this country before the City was served with the complaint. Def. Mem., Ex. 3, Imanse Decl. ¶ 11. The City argues that the artwork was not "present in the United States" as a matter of fact when the City was served and was not "present in the United States" as a matter of law during the course of the exhibitions.

It is undisputed that the 14 works were physically present in the United States when the Malewicz Heirs filed the first complaint in this matter. The City understandably likens FSIA § 1605(a)(3) to an *in rem* action and points out that jurisdiction in an *in rem* action vests only upon assertion of judicial authority over the *res* and not upon the filing of opening papers. *Republic National Bank v. United States*, 506 U.S. 80, 84–85, 113 S.Ct. 554, 121 L.Ed.2d 474 (1992), indicates that the assertion of authority over the *res* is ordinarily accomplished by seizure, which is "regarded as equivalent to the particular service of process in the courts of law and equity." 506 U.S. at 85, 113 S.Ct. 554 (*quoting Taylor v. Carryl*, 61 U.S. 583, 599, 20 How. 583, 15 L.Ed. 1028 (1857)). "Seizure" in this instance would be unavailable because of the Immunity from Seizure Act. The problem with the City's argument is that it ignores the salient history and purpose of FSIA.

 "[F]oreign sovereign immunity is a matter of grace and comity rather than a

constitutional requirement . . . ." *Altmann*, 124 S.Ct. at 2248. From the earliest years of the Republic until 1976, U.S. courts "consistently . . . deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction . . ." over actions involving foreign sovereigns. *Id.* (quoting *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983)). In 1952, the State Department officially adopted the "restrictive theory" of sovereign immunity, whereby a sovereign acting "with regard to sovereign or public acts (*jure imperii*) of a state" would be granted immunity, but no immunity would be recognized "with respect to private acts (*jure gestionis*)." *Id.*[3] Because of inconsistent standards in applying restrictive theories of sovereign immunity between the Executive and Judicial Branches, Congress passed FSIA in 1976 to codify the restrictive theory of sovereign immunity and to place primary responsibility for interpreting and applying FSIA standards in the Judiciary and away from political pressures in the Executive. *Id.* at 2249; *see also Cicippio–Puleo v. Islamic Republic of Iran*, 353 F.3d 1024, 1034 (D.C.Cir.2004)(FSIA "was intended to preempt other federal or state law that accorded sovereign immunity, and to discontinue the practice of judicial deference to suggestions of immunity from the executive branch."). Critically for this point, FSIA intentionally overrode the common-law requirement that a plaintiff obtain *in rem* jurisdiction over property before suit could be filed against a foreign sovereign. *See* U.S. Statement at 6 ("Section 1605(a)(3) of the FSIA, first effective

**3.** The Court quoted from a Letter from Jack B. Tate, Acting Legal Adviser, U.S. Dept. of State, to Acting U.S. Attorney General Philip B. Perlman (May 19, 1952), reprinted in 26 Dept. State Bull. 9840985 (1952), and in

*Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) (App. 2 to opinion of White, J.). *See Altmann*, 124 S.Ct. at 2248 n. 11.

in 1977, provides for the possibility of *in personam* jurisdiction over foreign states in expropriation cases without the need for the prior attachment of the property in question.")(citing H.R. Rep. 94–1487, 94th Cong., 3d Sess. at 8, *reprinted in* 1976 U.S.C.C.A.N. 6604, 6606). It would be anomalous to re-insert the jurisdictional requirements of an *in rem* action when Congress so clearly intended to remove them from consideration. The Court concludes that Plaintiffs' filing of the complaint while the artworks were physically present in this country was sufficient to meet the "present in the United States" factor of FSIA without regard to later service of the complaint.

Whether the artworks were present in the United States for purposes of legal process raises a different question and is one of the points on which the United States has indicated its Interest.[4]

The Department of State administers the Mutual Educational and Cultural Exchange Program, pursuant to 22 U.S.C. § 2459 (" § 2459"), which protects imported artworks and cultural objects by making them immune from seizure and other forms of judicial process. It is undisputed that the Malewicz Heirs could not seek to seize the artwork while it was in this country under a grant of such § 2459 immunity. Pls.' Opp. at 6–7. Plaintiffs do not contend that they could have filed this FSIA suit prior to the importation of the works or following their departure. Compl. ¶¶ 3–7. As described by the United States, "Plaintiffs are therefore using the window of opportunity afforded by the Malewicz exhibition[s] as the jurisdictional hook for their claims." U.S. Statement at

4. Plaintiffs do not disagree. Pls.' Response at 5.

There is no doubt that § 2459 fulfills an important role in fostering the exchange of art and cultural works between this country and other nations. In the past ten years alone, the State Department has published immunity notices under § 2459 for more than 600 exhibits. U.S. Statement at 4, 5 n. 3. The United States informs the Court that § 2459 was enacted to protect such exchanged works because the Second Hickenlooper Amendment, 22 U.S.C. § 2370(e)(2), adopted one year before § 2459, had exposed such works to seizure. U.S. Statement at 5. The Second Hickenlooper Amendment "sharply restricted application of the Act of State doctrine as a bar to jurisdiction over claims to property allegedly taken in violation of international law." *Id.* at 5–6. Section 2459 was passed to address this "threat to cultural exchange" and specifically to address situations in which "[a]s a condition to the loan, [a foreign nation] insisted on a grant of immunity from seizure as protection against [its] former ... citizens who had valid claims to the title of the works." *Id.* at 6 (*quoting* Rodney M. Zerbe, *Immunity from Seizure for Artworks on Loan to United States Museums*, 6 NW. J. Int'l L. & Bus. 1121 n. 21 (1985)).

The United States argues that § 1605(a)(3) of FSIA "requires a sufficient nexus with the United States to provide fair notice to foreign states that they are submitting themselves to U.S. jurisdiction and abrogating their sovereign immunity." *Id.* at 6–7. The connection under § 1605(a)(3) is, of course, that the foreign state is carrying on a commercial activity in this country and not conducting itself as

---

4. "The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." 28 U.S.C. § 517.

a sovereign. According to the United States, "[f]oreign states are unlikely to expect that this standard is satisfied by a loan of artwork for a U.S. Government-immunized exhibit that must be carried out by a borrower on a non-profit basis." *Id.* at 7. The United States urges the Court to give its concerns "great weight 'as the considered judgment of the Executive on a particular question of foreign policy.'" *Id.* (*quoting Altmann,* 124 S.Ct. at 2255). Because it expresses no opinion on the resolution of this specific case, the United States does not address the arguments of the parties as to whether these exhibitions were or were not "commercial" in nature.

The City, of course, supports the Statement from the United States and its expression of concerns that a confluence of FSIA expropriation jurisdiction and cultural exchanges will reduce such exchanges. Further, it argues that the 14 Malewicz works at issue were protected by the immunity from judicial process provided by § 2459 and therefore were not "present in the United States" for legal purposes. Def. Mem. at 4; Def. Reply at 5.

■ The U.S. Statement presents the Court with something of a dilemma. The opinions of the United States are entitled to "great weight," especially when speaking in the realm of foreign policy as the Statement does with respect to cultural exchanges and interpreting the statutory terms that affect the Mutual Educational and Cultural Exchange Program. However, the Court concludes that § 2459 granting immunity and § 1605(a)(3) establishing jurisdiction for certain claims against a foreign sovereign are both clear and not inconsistent. The Court is bound to the plain meaning of these statutes. *See Suburban Transit Corp. v. I.C.C.,* 784 F.2d 1129, 1130 (D.C.Cir.1986). The relationship between the two statutory provisions is more clearly perceived by the Malewicz Heirs: in fact, they are unrelated except that a cultural exchange might provide the basis for contested property to be present in the United States and susceptible, in the right fact pattern, to a FSIA suit.

Clearly, as the United States and the City argue, § 2459 protects loaned artworks and cultural items from seizure or judicial process "for the purpose or having the effect of depriving such [U.S. cultural] institution ... of custody or control of such object." 22 U.S.C. § 2459. A litigant with a claim against a foreign sovereign may *not* seize that sovereign's property that is in this country on a cultural exchange and the litigant may *not* serve the receiving museum with judicial process to interfere in any way with the physical custody or control of the artworks. The Malewicz Heirs have tried to do neither. They have sued the City of Amsterdam, not the Guggenheim or the Menil Collection. Had this lawsuit begun and concluded before the Malewicz Collection left this country, no order of this Court would have, or could have, affected the custody or control that the museums (and carriers) exercised over the artworks. The Immunity from Seizure Act deprives all U.S. courts from taking any action to obtain physical custody of the Malewicz Collection or other cultural icons granted immunity while in this country.

Instead, the happenstantial presence in this country of 14 pieces by Kazimir Malewicz fulfilled one requirement for FSIA jurisdiction: that the contested property be "present" in this country at the time of suit. The current absence of the artworks from the United States might make a court order to return the works to the Malewicz Heirs only as valuable as their ability to persuade a Dutch court to enforce it but, because of § 2459, the pres-

ence or absence of the property makes no difference during the litigation, as long as it was "present" when suit was filed.

■ Because the Malewicz Heirs are not seeking judicial *seizure* of the artworks, the City's and the United States' reliance on § 2459 is misplaced. Immunity from seizure is not immunity from suit for a declaration of rights or for damages arising from an alleged conversion if the other terms for FSIA jurisdiction exist. *See generally Magness v. Russian Fed'n,* 84 F.Supp.2d 1357, 1358–59 (S.D.Ala.2000)(noting that while the cultural artifacts at issue were immune from seizure, plaintiffs who obtained judgment against defendants for expropriation of the artifacts in violation of international law could recover on their judgment in some other fashion).

■ The United States argues that FSIA requires "fair notice to foreign states that they are submitting themselves to U.S. jurisdiction" and that "[f]oreign states are unlikely to expect" that a loan of artwork could be deemed commercial activity by the foreign state. U.S. Statement at 7. Whether the United States does or does not recognize a foreign state's sovereign immunity "reflects current political realities and relationships" among nations and provides "protection from the inconvenience of suit as a gesture of comity." *Altmann,* 124 S.Ct. at 2252 (*quoting Dole Food Co. v. Patrickson,* 538 U.S. 468, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003)). "Fair notice" is not part of the equation for court consideration. *Id.* ("[T]he principal purpose of foreign sovereign immunity has never been to permit foreign states and their instrumentalities to shape their conduct in reliance on the promise of future immunity from suit in United States courts.").

The Court concludes that the 14 Malewicz artworks were "present in the United States" for purposes of FSIA jurisdiction.

## C. Commercial Activity by the Foreign State

Plaintiff's amended complaint states without elaboration that the 14 Malewicz pieces were "in the United States in connection with a commercial activity carried on in the United States by Amsterdam, namely loaning the 14 works for exhibitions in the United States starting in May 2003." Am. Compl. ¶ 6. The United States advises that "[t]he possibility that such a minimal level of contact will necessarily suffice to provide jurisdiction threatens to chill the willingness of sovereign lenders to participate in the section 2459 program." U.S. Statement at 7. The City of Amsterdam agrees and states that it would not have loaned the Malewicz artworks if it had known that it could face litigation. It also protests that it was merely a lender from a distance and not engaged in commercial activity here.

In determining whether a foreign state has engaged in "commercial activity" in the United States, the Congress has done us no favors by its choice of words. "We do not, however, have the option to throw up our hands. The term has to be given some interpretation, and congressional diffidence necessarily results in judicial responsibility to determine what a 'commercial activity' is for purposes of the Act." *Saudi Arabia v. Nelson,* 507 U.S. 349, 359, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993). "Congress deliberately left the meaning open and ... 'put [its] faith in the U.S. Courts to work out progressively, on a case-by-case basis ... the distinction between commercial and governmental.'" *Millen Industries,* 855 F.2d at 884 n. 6 (*quoting Texas Trading & Milling Corp. v.*

*Federal Republic of Nigeria,* 647 F.2d 300, 308–09 (2d Cir.1981)).

Before beginning that effort, it is critical to appreciate the real issue here: the Malewicz Heirs are not suing the City of Amsterdam "based on" alleged "commercial activities" of the City in this country. Many of the cases that address FSIA's definition **of** "commercial activity" do so in the context of whether that activity was (a) "commercial" and (b) whether the cause of action was "based on" that activity. *See id.* at 884. In the context of this lawsuit, Plaintiffs' claims are not "based on" the alleged commercial activity of Amsterdam in the United States at all; thus, the analysis is subtly, but importantly, different.

■ At 28 U.S.C. § 1605(a)(3), FSIA allows suits against foreign states over "rights in property taken in violation of international law ... [when] that property ... is present in the United States in connection with a commercial activity carried on in the United States by the foreign state." At 28 U.S.C. § 1603(e), we are instructed that "commercial activity carried on in the United States by a foreign state" means "commercial activity carried on by such state and having substantial contact with the United States." Our Circuit has essentially adopted the "rule of thumb" suggested by the Second Circuit in *Texas Trading:* "[I]f the activity is one in which a private person could engage, it is not entitled to immunity." *Practical Concepts, Inc. v. Republic of Bolivia,* 811 F.2d 1543, 1549 (D.C.Cir.1987)(*quoting Texas Trading,* 647 F.2d at 309). "Congress did indeed contemplate that courts would regard as key the question whether the foreign sovereign's contract issue is 'of the same character as a contract which might be made by a private person.'" *Id.* (citing H. REP. No. 1487, 94th Cong., 2d Sess. 16 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin. News 6604, 6615); *see Millen*

*Industries,* 855 F.2d at 884 ("A useful inquiry ... is whether the essence or central elements of an agreement made by a foreign state might be made by a private person.") (citations omitted). It is the "nature of [the] activity, *e.g.,* purchase contract, not its purpose, *e.g.,* providing food for the needy, [that] determines whether activity is commercial." *Practical Concepts,* 811 F.2d. at 1551 n. 18.

The use of the word "commercial" in § 1605(a)(3) of FSIA leads one to a detour from the statutory purpose by thinking of distinctions between activities that are for-profit, not-for-profit, educational, cultural, philanthropical, etc. However, as noted by the Supreme Court in *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992):

> [B]ecause the Act provides that the commercial character of an act is to be determined by reference to its "nature" rather than its "purpose," the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in "trade and traffic or commerce."

*Id.* at 614, 112 S.Ct. 2160 (emphasis in original) (citations omitted). In large measure, the terms "commercial" and "sovereign" are merely opposites: if an act is something only sovereigns do, it is not "commercial." Similarly, if an act is something that a private person or entity *can* do, it is not "sovereign." "Commercial" means only "not sovereign," as long as there is some example of private action of a similar type connected with "trade and traffic or commerce." *Id.; see Millen Industries,* 855 F.2d at 884 n. 6 (The court must parse "the distinction between com-

mercial and governmental")(quoting *Texas Trading*, 647 F.2d at 308–09).

▆ With this understanding, it is clear that the City of Amsterdam engaged in "commercial activities" when it loaned the 14 Malewicz works to museums in the United States. There is nothing "sovereign" about the act of lending art pieces, even though the pieces themselves might belong to a sovereign. Loans between and among museums (both public and private) occur around the world regularly. The City resists this conclusion, asserting that the exchange of artworks between not-for-profit organizations in different countries does not constitute "trade and traffic or commerce." Def. Mem. at 6. There is force to the argument and the Court has considered it with great care. Ultimately, because the international loan of artworks between museums can and does occur with potential sales of the works contemplated by the parties (which is undoubtedly "commerce" in the traditional sense), and because it is the *type* of activity—not its purpose—that must guide the analysis, the Court finds the City's argument unpersuasive.

The record is replete with evidence that artwork is loaned internationally and domestically on a frequent basis. The parties appear to agree that this particular loan was for purely educational and cultural purposes—certainly, the Stedelijk Museum entered into the loan without any intention of offering the Malewicz works for sale. Does that remove this kind of sovereign loan from "commerce," even though loans for purely educational or cultural purposes are also conducted by private parties? The distinction Amsterdam wishes the Court to draw would depend on the *purpose* of a loan: if a loan promotes only educational or cultural goals it would be exempt from the reach of FSIA while a loan that has additional attributes more in line with traditional concepts of "commerce" would not. FSIA itself dooms the distinction because the Court is not to consider the purpose of the activity. *See* 28 U.S.C. § 1603(d)("The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."); *see Weltover*, 504 U.S. at 614, 112 S.Ct. 2160; *Practical Concepts*, 811 F.2d. at 1551 n. 18.

An example might make this point clear. Suppose the Stedelijk agreed with the Guggenheim and the Menil Collection to loan the museums specific Malewicz paintings that have great fame and have never traveled away from Amsterdam. Suppose the American museums advertised heavily that these great works would be seen for the first time outside of The Netherlands and, as a result, developed significant corporate and other support. Then suppose the Stedelijk became concerned over the safety of the paintings and sent, instead, lesser works of Malewicz that had earlier been displayed in this country. Would the Guggenheim or the Menil Collection be able to sue the Stedelijk for breach of contract or would sovereign immunity protect the Dutch museum? The example is fantastic and would likely never happen. But it clearly demonstrates the logic of finding that the Stedelijk was not engaging in a "sovereign" act when it loaned artworks that it asserts properly belong to the sovereign.[5]

---

**5.** *Aschenbrenner v. Conseil Regional de Haute–Normandie*, 851 F.Supp. 580 (S.D.N.Y.1994), on which the City relies, does not compel a different result. First, it was decided under the test of commercial activity adopted by the Second Circuit under which "[t]he court must inquire whether the activity is of the type an individual would customarily carry on for profit." *Id.* at 584 (*citing Morel de Letelier v. Republic of Chile*, 748 F.2d 790, 797 (2d Cir.

There is one further critical point. The City of Amsterdam and the United States argue that the City's contacts with this country are insubstantial and insufficient to expose it to FSIA jurisdiction. Def. Mem. at 9 ("Indeed, as expected and intended in such an act of courtesy, the loan-handling fees received from the American museums were nominal and did not cover even the administrative and other costs incurred by the Stedelijk Museum, causing the Stedelijk Museum to lose money."); U.S. Statement at 7 ("Foreign states are unlikely to expect that this standard [presence in the United States in connection with a commercial activity] is satisfied by a loan of artwork for a U.S. Government-immunized exhibit that must be carried out by a borrower on a non-profit basis. The possibility that such a minimal level of contact will necessarily suffice to provide jurisdiction threatens to chill" the entire international exchange program.). This is not an insubstantial point and it requires a detailed factual analysis of the nature and extent of such contacts. *See Saudi Arabia v. Nelson*, 507 U.S. 349, 356, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993); *Burnett v. Al Baraka Invest. and Develop. Corp.*, 292 F.Supp.2d 9, 21 (D.D.C.2003); *Sealift Bulkers, Inc. v. Republic of Armenia*, 965

F.Supp. 81, 85 (D.D.C.1997) (noting the constitutional parameter to the question).

 The existing record does not permit the Court to ascertain the substantiality of the City's contacts or activities with or in the United States in connection with the loan of the Malewicz artworks. Apart from the presence of the artworks themselves, what were the terms of the loan agreements? Did the Stedelijk send any representatives to this country to work out arrangements, to travel with the art, or to oversee its safety and display? What consideration did the Guggenheim or Menil Collection offer for the loan—money, a future loan of American art to The Netherlands, a share in any receipts from visitors, catalogue sales, and the like—or was this only a courtesy between professionals in the art world, as the City argues? The extent and the nature of the City of Amsterdam's contacts with this country must be identified and addressed before the Court can determine its own jurisdiction, or lack thereof, over Plaintiff's amended complaint.

## V. CONCLUSION

For the foregoing reasons, the City of Amsterdam's motion to dismiss will be DENIED. The Court will convene a sta-

---

1984)). However, as noted above, the Supreme Court has noted that whether the activity is being engaged in for profit is not relevant to the determination of whether that activity is "commercial." *See Weltover*, 504 U.S. at 614, 112 S.Ct. 2160 ("[B]ecause the Act provides that the commercial character of an act is to be determined by reference to its "nature" rather than its "purpose," the question *is not* whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives")(emphasis added); *see also* 28 U.S.C. § 1603(d) (the nature of the conduct matters but not its purpose). Second, the *Aschenbrenner* court harmonized its controlling precedent and the terms of FSIA by relying on "the

distinction between a profit motive and a resemblance to profit-seeking activities," which that court labeled "abstruse." *Aschenbrenner*, 851 F.Supp. at 585. Third, of course, *Aschenbrenner* is not controlling and is to be followed only to the extent it is persuasive. Were this Court to apply its "abstruse" test, the Court would conclude that loaning artworks, as did the Stedelijk, exactly resembles conduct in which private museums and persons engage when they desire visibility and potential sales for the art, a clearly commercial, for-profit purpose. The facts of *Aschenbrenner* demonstrate that very fact. Counsel have merely discovered that not all district court judges agree.

tus conference to determine whether the parties wish to proceed by way of affidavits or limited jurisdictional discovery to develop record evidence on whether, through its immunized loan of cultural and educational artworks, the City of Amsterdam had "substantial contact with the United States" within the meaning of 28 U.S.C. § 1603(e). At that time, the Court will also inquire of the City whether it and the courts of The Netherlands will waive any potential statute-of-limitations defenses. A memorializing order accompanies this memorandum opinion.